IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 20-18 |
| | : | |
| MICHELLE CUTTINO | : | |

# SENTENCING MEMORANDUM OF MICHELLE CUTTINO

## I. INTRODUCTION

Michelle Cuttino is a fifty-eight-year-old first-time nonviolent offender. She was paid hourly in the $20 to $30 range for nursing services. She never shared in the profits of the durable medical equipment vendors. She was misled and deceived into getting involved in Medicare fraud. Initially she never intended to participate in any illegal activity. She did fail to withdraw from such activity after red flags appeared and she learned that she was involved and then continued to participate in illegal activity. She had pleaded guilty and fully accepted responsibility for her actions. Michelle Cuttino is a good person who made a serious mistake. It is respectfully submitted that under all the facts and circumstances of this case she should be shown leniency.

## II. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE, 18 U.S.C. §3553(a)(1)

The nature, circumstances, and facts of the offense, as stated in Michelle's own words, or as follows:

> In 2017 I was working full-time as a nurse practitioner managing short-term rehabilitation patients during the daytime. I also worked evenings, weekends and holidays as a part-time telephonic on-call nurse practitioner providing remote coverage to long-term care facilities. I was also working conducting in home health assessments. When that

contract ended, I looked for something additional which I could do part-time from home in addition to my full-time employment. I looked on the "Indeed" job site for remote/on-call telephonic nurse practitioner positions. After submitting my resume for several opportunities, I was contacted and hired by the administrator of Advantage Choice Care. They were seeking Pennsylvania licensed nurse practitioners to conduct telephonic patient consultations for orthotic braces. I was unaware that Medicare regulations required hands-on physical examinations for certain braces. Nobody at any of the telemedicine durable medical equipment (DME) companies I worked for ever told me that. They all deceived and led me to believe that telephonic consultation was all that was needed.

I was trained online and over the telephone. The hiring nurse practitioner explained to me that the initial patient outreach calls were made by Advantage Choice Care staff members. Those staffers would be entering all medical and exam information into the online patient chart. I was instructed to review the patient's information provided in the medical history section, and confirm the information provided in the exam section of the chart with the patient. I was not given any instruction or training in Medicare rules or regulations. My questions were answered and no "red flags" were apparent to me. I did not intend to get involved in anything illegal or improper. Advantage paid $20.00 for each of my submitted consults whether medical need was approved or denied by me.

When I started, I would review and confirm the patient history and exam information online that had been obtained and entered by Advantages' intake staff. The information appeared thorough. As I conducted the consults, it developed that many times the patients denied medical need. Sometimes after talking to the patient 1 approved one brace but denied another. Advantage was displeased that I did not approve more braces. As the situation proceeded it became more suspicious.

Around November 2017, the workflow from Advantage slowed considerably. Looking to compensate, I submitted my resume on the

Indeed job site for another company which was looking for nurse practitioners and doctors to do similar work. I was hired by MedCare Staffing, which provides staffing for various health care organizations. MedCare placed me with Integrated Support Plus, headquartered in Spring Hill, Florida. The work was essentially the same. Over time, I was pressured more and more by Integrated and MedCare to cut comers and approve more and more braces. I was not happy. It did not feel right to me, but I needed the money and did not leave. My elderly mother and stepfather were living with me, and I supported them. Money was very tight.

In August 2018, I left my full-time position in the sub-acute rehabilitation setting and started working full-time with Matrix conducting health assessments in patients' homes. I also transitioned to per diem status with Optum Care. In mid-December 2018 I resigned my position with Matrix because of egregious work conditions. I now needed additional employment as my Optum position only offered a schedule of 24 hours bi-weekly. I was still working for Advantage Choice Care, but work volume was very low. At this time William McNeal of Integrated Support emailed a group of providers offering compensation of $30/completed consult. I needed the income and started working directly for Integrated Support Plus right after the New Year.

By mid-January I was working full hours, but the unsettled feeling that not everything was proper began to resurface. When I started with Advantage Choice Care, the average number of braces requested per consult was two. MedCare Staffing consults were consistent with that number, with the occasional outlier or three. After restarting directly with Integrated Support Plus, the consults varied from requests for a single back brace to requests for back, knee, shoulder and wrist braces all on one consult. The volume of braces become increasingly unreasonable. I did not believe that so many requested braces were truly medically necessary. Nonetheless this was my major income at this point, I had family financial responsibilities, and I approved them. There was also increasing pressure from Integrated to deviate from standard protocol. There was a growing push to approve braces based on the information in the chart alone and not call patients at all unless

> additional information was needed. I knew this was not right. It did bother me. I should have followed my instincts, done what I knew was the right thing and walked away. I failed to do that. It was not my intention to participate in anything illegal or fraudulent when I started this work. I have only myself to blame for not walking away after I found myself in a bad situation and realized what was happening. I truly regret failing to do the right, honest thing.

## III. HISTORY AND CHARACTER OF MICHELLE CUTTINO, 18 U.S.C. §3553(a)(1)

Michelle's history and character are discussed at length in letters being submitted to the court by her family, friends, and acquaintances. Rather than duplicate that information here, we will rely on those letters written by persons who are far more knowledgeable and much better situated to cover this area than counsel. The PSR does an excellent in-depth job at covering her history. Again, we will rely on it and not repeat the same information here.

## IV. ADDITIONAL 18 U.S.C. §3553(a) AND MISCELLANEOUS FACTORS

An additional factor in determining an appropriate sentence, one that is "sufficient, but not greater than necessary," 18 U.S.C. §3553(a), is protecting the public from further crimes of the defendant. 18 U.S.C. §3553(a)(2)(C). There clearly is no need to lock away this first offender for the purpose of protecting anyone. Since 2020 she has been under probation-like Pretrial Services restrictions and supervision and has been in no trouble whatsoever. The Court has granted her permission to travel outside the district, including internationally to attend a child's wedding in Mexico, all without issue. Her offense occurred nearly 10 years ago with no subsequent misconduct. She will almost certainly lose her nursing licenses. She will not only be disqualified and therefore unable to repeat the offense conduct, but she will also suffer a very severe independent state level penalty in addition to those which will be imposed by this court. She will incur sharply reduced income.

Michelle now sees a psychotherapist. This did not begin until after she was charged and started trying to cope with the stress of worrying about what the result of this case would be. This new worry, added to the other stressors in her life, caused her to need continued psychotherapy.

## V. CONCLUSION

Michelle Cuttino promptly accepted full responsibility for her offense conduct. She clearly is very remorseful. Good people can and do make serious mistakes in their lives. She respectfully requests leniency.

A criminal defendant must not be judged by his worst mistake, but by the totality of his life's deeds. As stated by the Supreme Court in the opening of its opinion in Concepcion v. United States, 597 U.S. 481 (2022):

> There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her "as an individual." *Koon* v. *United States,* 518 U. S. 81, 113 (1996). In line with this history, federal courts today generally "exercise a wide discretion in the sources and types of evidence used" to craft appropriate sentences. *Williams* v. *New York,* 337 U. S. 241, 246 (1949). When a defendant appears for sentencing, the sentencing court considers the defendant on that day, not on the date of his offense or the date of his conviction. *Pepper* v. *United States,* 562 U. S. 476, 492 (2011).

MARC DURANT
Durant & Durant LLC
40 Bowmans Drive
New Hope, PA 18938
mdurant@durantlaw.com
267-221-1900
Counsel for Michelle Cuttino

CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2026 a copy of the foregoing document was served via ECF upon all counsel of record

MARC DURANT
Durant & Durant LLC
40 Bowmans Drive
New Hope, PA 18938
mdurant@durantlaw.com
267-221-1900
Counsel for Michelle Cuttino